IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EVERYTHING CYCLES, INC.,

   Plaintiff,

vs.

AMERICAN HONDA MOTOR CO., INC.,
   Defendant.

Civ. No. 07-1170-TC

OPINION AND ORDER

COFFIN, Magistrate Judge.

Before the court is defendant's motion for summary judgment (#31). For the reasons that follow, summary judgment is granted. Further, as stated below, the court enters judgment declaring that "good cause" supports defendant's termination of its Sales and Service Agreements with plaintiff under.

## BACKGROUND

The record discloses the following facts. Plaintiff Everything Cycles, Inc. (ECI), is a motorcycle retail company owned by Randy Wing. ECI entered into Sales and Service Agreements with defendant American Honda Motor Co. (AHM), which permitted plaintiff to sell and service Honda motorcycles, motor

1 Opinion and Order

scooters, and all-terrain vehicles. Until July 2007, Wing operated the business in Roseburg, Oregon.

The Sales and Service Agreements allow termination under certain circumstances. AHM may terminate the agreement when a dealer is accused of a crime that may adversely affect the reputation of the dealer or AHM, or where the dealer is convicted of a crime that may adversely affect the goodwill or reputation of AHM.[1] Def. Ex. 12-14. Termination is also permitted when the dealer fails to maintain a business license or relocates the business without AHM's consent. Id.

In 2005, Wing was convicted of two counts of theft, one count of attempted theft, and one count of possession of a stolen vehicle. The convictions arose from Wing's purchase of a stolen Suzuki motorcycle on eBay. The record demonstrates that Wing was not fully forthcoming with the police during the investigations, and at times, he was dishonest with them concerning his

---

[1] The agreements state that termination is permitted where

> [a]ny accusation or charge of any crime or violation of any law relating to Dealership Operations by Dealer . . . is substantiated to its satisfaction or which, even if unsubstantiated, in American Honda's judgment may have an adverse effect on the reputation of Dealer, the Dealership Operations or American Honda; or any conviction in any court of original jurisdiction of dealer or of any of the Dealer Owners or any employee of Dealer for any crime or violation of any law if, in the opinion of American Honda, such conviction or violation may adversely affect the conduct of the Dealership Operations or tend to be harmful to the goodwill or reputation of American Honda, Honda Products, or the Honda Trademarks, whether or not such crime or violation of law is directly related to or arises out of the Dealership Operations[.]

Def. Ex. 12-14.

2 Opinion and Order

possession of certain parts. He also told an employee to lie to the police about the location of parts. For sentencing purposes, the felony theft and possession counts were reduced to misdemeanors. See Or. Rev. Stat. § 161.705. His convictions were affirmed after appeal to the Oregon Court of Appeals, and the Oregon Supreme Court denied review.

After his conviction and failed appeal, the City of Roseburg revoked ECI's business license because the crimes of conviction were related to his business dealings. The revocation was sustained on appeal. Wing was permitted an extension of the revocation enforcement period in order to relocate his business outside of the city's boundaries. The convictions and business license revocation attracted media attention, appearing in a newspaper and on news websites.

On May 18, 2007, AHM sent a Notice of Termination to ECI, citing Wing's conviction and the revocation of his business license. ECI then applied for approval from AHM to relocate to Sutherlin, Oregon. In response, AHM stated that the application would be denied unless ECI remedied the grounds for termination. ECI relocated to Sutherlin without permission, and AHM then sent further Notices of Termination based on ECI's unauthorized relocation.

ECI thereafter brought this action, seeking a declaratory judgment stating that AHM's termination of the Sales and Service Agreements lacked "good cause" under Or. Rev. Stat. § 650.140. AHM counterclaims for a judgment declaring that the requirements of that statute are met, and termination is appropriate. AHM moves for summary judgment. For the following reasons, the

3 Opinion and Order

motion is granted.

## STANDARD

Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). On a motion for summary judgment, all reasonable doubt as to the existence of a genuine issue of fact is resolved against the moving party, Hector v. Wiens, 533 F.2d 429, 432 (9th Cir. 1976), and any inferences drawn from the underlying facts are viewed in the light most favorable to the nonmoving party. Valadingham v. Bojorquez, 866 F.2d 1135, 1137 (9th Cir. 1989).

The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. Celotex Corp. v. Catrett, 477 U.S. 317 (1986).

Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of

4 Opinion and Order

her case with respect to which she has the burden of proof. Id. at 323-24.

## ANALYSIS

In this case, the record requires no further development, and the court's inquiry reduces to this question: Is there "good cause" for AHM's termination under Or. Rev. Stat. § 650.140? The statute provides that, "[n]otwithstanding the terms of any franchise or other agreement," a manufacturer may not terminate a franchise "without showing good cause," provided that the dealer protests the termination by filing a complaint within the notice period provided by the statute.

The statute then guides the court's inquiry concerning whether good cause exists:

> In determining if good cause exists pursuant to subsection (1) of this section, the court shall consider such factors as:
>
> (a) The amount of business transacted by the dealer as compared to the amount of business available to the dealer.
>
> (b) The investment necessarily made and obligations necessarily incurred by the franchisee in performance of the franchise.
>
> (c) The permanency of the investment.
>
> (d) The adequacy of the franchisee's new motor vehicle sales and service facilities, equipment and parts.
>
> (e) The qualifications of the management, sales and service personnel to provide the consumer with reasonably good service and care of new motor vehicles.
>
> (f) The failure of the franchisee to substantially comply in good faith with those requirements of the franchise that are reasonable.

5 Opinion and Order

Or. Rev. Stat. § 650.140(2). As Judge Aiken has explained, "it is the court's responsibility to determine whether good cause exists to terminate a franchise agreement." Cascade Motorsports of Oregon v. American Suzuki Motor Corp., No. 03-6263-AA, 2004 WL 1839434 at *6 (D. Or., Aug. 16, 2004).

Before engaging in that inquiry, I am called upon to resolve a question of statutory interpretation. The parties disagree about whether the court must consider each and every factor recited in Or. Rev. Stat. § 650.140(2) when determining whether "good cause" exists, and they dispute whether weight should be assigned to each factor equally. As AHM argues, in its plainest sense, the phrase "such factors as" would suggest that the listed factors include options among many possible considerations that the court might employ in deciding a particular case. ECI contends that this court should look to the opinion of Circuit Joan G. Seitz, which held that each factor requires consideration. Judge Seitz based her analysis on Welches School Dist. v. Welches Educ. Ass'n, 842 P.2d 437 (Or. App. 1992), review denied, 854 P.2d 940 (Or. 1993), an appellate opinion that construed similar language in Or. Rev. Stat. 243.682(1) and concluded that the court must consider each listed factor. Judge Seitz added that full consideration of each factor implements the legislature's purpose in enacting the statute, which is to ensure the availability of meaningful judicial review of a franchisor's proposed termination decision. In plaintiff's view, such an interpreation of the statute would not allow a single "good cause" factor to outweigh any other.

When interpreting an Oregon statute, the court's goal is to

6 Opinion and Order

give effect to the legislative intent. PGE v. Bureau of Labor and Industries, 859 P.2d 1143 (Or. 1993). If the terms of the statute are ambiguous, the court looks to the text of the statute within the context of the code in order to determine whether the ambiguity is resolved. If not, the court turns to the legislative record in order to discern the legislative intent. Id.

In this case, the terms of the statute give rise to some ambiguity concerning the scope of the court's "good cause" inquiry. On the one hand, the term "shall" indicates a legislative mandate to the court to consider stated factors. However, the phrase "such factors as" suggests that the statute contains a nonexclusive list, implying that other relevant information may be considered in each fact-laden determination. Further, the phrase "good cause" sounds in equity. Although the inquiry is governed by statute, the ultimate determination of the court concerns whether a termination is fair. Such an inquiry will necessarily draw from a number of factual considerations, each carrying its own weight within the larger, comprehensive analysis.

The context of the statute provides little guidance. Although I understand that the Oregon Court of Appeals considered a statute containing a similar term in Welches School Dist. v. Welches Educ. Ass'n, the court did not undertake an analysis of the terms of the statute and did not provide a holding concerning statutory interpretation that would be applicable to the issue in this case. Nor do I find any guidance from the context of provisions surrounding Or. Rev. Stat. § 650.140.

I turn, then, to the legislative record, which is

7 Opinion and Order

instructive. Or. Rev. Stat. § 650.140 originated as Senate Bill (SB) 930, proposed in the 1979 Oregon Legislative Assembly. It was initially vetoed and then enacted in the 1980 Special Session. According to the Administrator of the Senate Committee on Transportation, the bill was designed to address

> the bargaining disparity between national and international manufacturers distributors and importers, and local automobile dealers [and] protect the local automobile dealer from <u>potential abuses by the manufacturer, distributor, or importer</u>. It gives the local dealer a chance to stop, through court action, prohibited conduct, and to recover damages for actual loss of money.

Measure Explanation, Senate Transportation Committee, A-Engrossed SB 930 (emphasis added).

The bill was proposed by the Eugene New Car Dealer Association to address a number of potential abuses by franchisors, including coercion of franchisees in illegal promotions, onerous inventory requirements, underpayment of franchisees for warranty work, and inhibiting transfer of franchise ownership. Tape Recording, Senate Transportation Committee, SB 930, May 23, 1979, Tape 38, Side 2 (statement of Paul Romain). There is little evidence in the legislative record that such abuses were frequent in Oregon; rather, the impetus appears to have stemmed from the concern that such abuses might occur, and from the enactment of similar protective legislation in other states. Minutes, House Business and Consumer Affairs Committee, SB 930, June 19, 1979, 4 (dialogue between Rep. Lombard and General Motors Attorney John Wilson).

Among those concerns was unfair termination of a franchise agreement. The bill's chief proponent, Paul Romain, representing

8 Opinion and Order

the Oregon Automobile Dealers Association, explained that protection from "arbitrary" termination of franchise agreements was appropriate because franchisees often enjoyed little bargaining power when negotiating the agreements and stood to lose significant investments into the franchise. Tape Recording, Senate Transportation Committee, SB 930, May 23, 1979 Tape 38, Side 2 (statement of Paul Romain). In order to preclude such situations, SB 930 included the opportunity for a franchisee to seek a judicial determination of whether "good cause" exists for termination.

Much of what can be discerned about the legislative intent for the court's role in determining "good cause" derives from an exchange between Romain and the members of the Senate Transportation Committee in a May 23, 1979 hearing.[2] At the hearing, Romain assured the committee that his client's intent was not to institute a complicated bureaucracy for governing franchise agreements, but to give dealers certain procedural protections that would guard against unfair practices that might result from an imbalance of bargaining power. Id.

Concerning the purpose of what would become Or. Rev. Stat § 650.140(2), Romain explained, "if the dealer <u>believes that he's being taken by the manufacturer</u> . . . he can go into court and enjoin the activity and the court will decide based on standards we have set out as examples, not exclusive standards, will decide

---

[2]The version of the provision discussed at the phase of the legislative process was largely similar to the provision later enacted; subsequently, the text of current Or. Rev. Stat. § 650.140(3), the procedures governing the dealer's invocation of the court's review, were added. See Minutes, Senate Transportation Committee, June 6, 1979, 2.

9 Opinion and Order

if there is cause to remove it." Id. (emphasis added). When asked by Senator Day about the meaning of "good cause," Romain explained that the term required a review of the circumstances of the agreement, which includes the listed factors and other relevant considerations. The review was designed to deter coercive practices that could result from an imbalance of bargaining power:

> The term "good cause" is, as you know from dealing with legislation all the time, is a very common word in statutes. Basically, what we are trying to do . . . is set out some guidelines for the court to use in determining good cause. We don't want to limit the court to this [list of factors]. We just want to tell the court basically what we're thinking about . . . look at the permanency of the investment, look at the business transacted by the dealer, look at the obligations incurred, look at the adequacy of the facilities that the franchisee has, the qualifications of the management, service that he is providing, the failure of the franchisee to substantially comply in good faith with the requirements of the franchise that are reasonable and material . . . in other words, what we want you to do in court is look at the total picture: Is this person complying with the franchise agreement, are they servicing the public, and look at all that, look at it, before you just arbitrarily allow a manufacturer [to cancel] <u>because the manufacturer is big, and because the manufacturer is big, the dealer is not able to get these things into a franchise agreement</u>[.]

Id. (emphasis added). Romain further emphasized that the factors listed in Or. Rev. Stat. § 650.140(2) provide guidelines of the courts inquiry and are nonexclusive:

> [Or. Rev. Stat. § 650.140(2) sets] guidelines for a court to use in determining what "good cause" is. Most of your statutes do not even go that far. Most of your statutes just say, "good cause," period. But what we're saying is the legislature should give the court some guidelines, and <u>when you're talking about "good cause," while it's a business transaction, and</u>

10 Opinion and Order

> <u>you shouldn't have to lay out everything in the statute because there are many variables that come in all the time</u>, the court should consider at least what we're talking about in [Or. Rev. Stat. § 650.140(2)].

Id. (emphasis added). Romain also explained that the list of considerations was "basically taken" from statutes in California and Texas, and were included because such considerations would be relevant in Oregon business as well. Id.[3] When asked by Senator Khafoury whether the motivation of the franchisor is relevant to the court's inquiry, Romain replied, "motivation of the manufacturer I think is one that the court can consider. The court is not precluded from considering that." Id. Thus, when read in the context of the statute's broader purpose, it is clear that whether a franchisor's motivations stem from abusive or coercive dealings can be relevant to the court's "good cause" inquiry.

A Eugene, Oregon car dealer, Mr. Huling,[4] also testified at the same hearing. Summarizing his position, he explained that the protections were needed to protect against potential abuses that might result from an imbalance of bargaining power: "Basically, what we are looking for is <u>more of a bilateral agreement with the manufacturer instead of unilateral</u> . . . we'd like our little day

---

[3] In a later hearing, Represenative Lombard observed that the California statute required the "good cause" determination to occur in an administrative agency, rather than in a court, but commented that the court venue was not problematic because the court's determination would be guided by the statutory factors in Or. Rev. Stat. § 650.140(2). Tape Recording, House Business and Consumer Affairs Committee, SB 930, June 19, 1979, Tape 28, Side 1 (statement of Rep. Lombard).

[4] No first name for. Mr Huling was cited in the legislative record.

11 Opinion and Order

in court once in a while." Tape Recording, Senate Transportation Committee, SB 930, May 23, 1979, Tape 38, Side 2 (statement of Mr. Huling) (emphasis added).

The provision was adopted by the Committee on June 6, 1979, after an amendment added at the suggestion of Lee Ridgeway of General Motors, which requires a dealer to file a complaint to initiate a "good cause" review of a franchisor's termination decision. Minutes, Senate Transportation Committeee, June 6, 1979, 2; Testimony, Senate Transportation Committee, SB 930, May 23, 1979, Ex. D (statement of Lee Ridgeway).

The bill was then forwarded to the House Business and Consumer Affairs Committee. Romain again reviewed the purpose of the bill's components, and explained the "good cause" requirement in this way:

> The dealer should be allowed a day in court as his expense to require the manufacturer to show that there is some good cause to terminate the franchise, especially when a dealer has put so much time, so much effort [into a franchise]. We try to set out in subsection 2 general standards for a court to look at in determining if there is good cause.

Tape Recording, House Business and Consumer Affairs Committee, SB 930, June 19, 1979, Tape 28, Side 1 (statement of Paul Romain).

Romain then noted that the provisions reflected amendments made in consultation with the bill's primary opponents, agents of General Motors who represented interests of franchisors. Id. At that hearing, Lee Ridgeway of General Motors testified that he did not know how the concern about inequitable terminations arose in Oregon and informed the committee, "We don't like to terminate dealers. That is not what we're in business to do." He explained

12 Opinion and Order

that terminations were infrequent at GM, occurring in only 12 of 13,000 cases over the previous year. Tape Recording, House Business and Consumer Affairs Committee, SB 930, June 19, 1979, Tape 28, Side 1 (statement of Lee Ridgeway). The Committee adopted amendments that did not substantially change the provision at issue, and the Vice-Chair moved that it be forwarded to the floor with a "do-pass" recommendation. The motion carried unanimously. Minutes, House Business and Consumer Affairs Committee, SB 930, June 19, 1979, 3. The bill was passed in both houses but vetoed in 1979. It was enacted the following year, in the 1980 Special Session.

Based on the foregoing information from the legislative record, I can discern four points that were made known to the committees that deliberated the bill and approved it. (1) Franchise agreements are business transactions that should be respected, but limited court review may be invoked to protect against an abuse of power in a termination decision. (2) The types of abuse of power contemplated included coercive business practices of franchisors, such as contract abuses to which franchisees might be susceptible to because of a lack of bargaining power. (3) The bill provides a procedural protection by allowing the franchisee an opportunity to ask a court to determine whether "good cause" supports a franchisor's termination decision. (4) The "good cause" determination is based on an examination of nonexclusive list of factors and any other relevant considerations that might reveal the types of coercive practices that the statute was designed to deter.

I note that the legislative discussions concerning the

13 Opinion and Order

court's role do not indicate that the court must allocate equal weight to each of the listed factors. Although it is clear that the drafters intended that each would receive some consideration by the court, they also emphasize that the court should consider any other factors that bear on the question of whether coercive practices influenced the termination decision. Necessarily, then, the court must consider, within the context of the relationship between the franchisor and franchisee, any factors that might indicate coercion and assign appropriate weight to those factors when determining whether the termination bespeaks a practice that the statute seeks to deter.

On the record before the court, the application of the factors to the facts of this case is straightforward. As an initial matter, the abuses of power that the statute was drafted to deter are absent in this case. There is no indication that plaintiff is the object of any coercive business practices. Rather, the record indicates that AHM and ECI had a profitable mutual relationship for a time prior to Wing's convictions. His license was thereafter revoked, and he was forced to relocate beyond the city line. He did so without permission from AHM and in violation of the Sales and Service Agreement. But for Wing's own breach of the agreement, there is no indication that the franchise would have been terminated.

I turn now to a consideration of the statutory factors, beginning with (2)(f), which weighs very heavily in AHM's favor. Under that subsection, the court considers "[t]he failure of the franchisee to substantially comply in good faith with those requirements of the franchise which are reasonable." There is no

14 Opinion and Order

dispute of fact concerning whether Wing was convicted of felonies related to his business;[5] he purchased a stolen motorcycle, understood that serial numbers had been intentionally removed, involved an employee in its disassembly, and implicated ECI in the transaction by testifying at the criminal proceeding that his store purchased the items. Further, the record indicates that Wing and ECI failed to comply with critical components of the mutually agreed-upon Sales and Service contracts, which required Wing to refrain from criminal activity that might affect AHM's reputation, maintain a business license, and acquire permission before relocating the dealership. Wing's actions demonstrate absolute disregard for AHM's licensing and relocation requirements. His convictions bespeak bad faith in dealings with potential customers, employees, the police, and those dealings endanger the reputation of his supplier, AHM.

Concerning subsection (2)(e), "[t]he qualifications of management, sales and service personnel to provide the customer with reasonably good service and care of new motor vehicles," I note that Wing's own conviction and license revocation cut heavily against his qualifications to serve as an AHM franchisee.

Although the remaining factors do not weigh as much against

---

[5] I note that Wing's felonies were reduced to misdemeanors for purposes of sentencing, but this does not change the factual point that he was convicted of felony crimes. See State v. Smith, 677 P.2d 715, 716 (Or. App.), aff'd, 691 P.2d 89 (Or. 1984) ("[A] person is 'convicted' of the crime of which he or she is found guilty. Entry of judgment of conviction is simply another matter.").

15 Opinion and Order

plaintiff, neither do they rescue his case.[6] Under subsection (2)(a), I am to consider "[t]he amount of business transacted by the dealer as compared to the amount of business available to the dealer." Here, I note that although ECI's ranking remained high for a period even after Wing's conviction, its performance decreased in recent months and has plummeted in Honda's national rankings, due in part to a general market downturn. Concerning subsections (2)(b) and (2)(c), "[t]he investment necessarily made and obligations necessarily incurred by the franchisee in the performance of the franchise," and the "permanency of the investment," plaintiff asserts that he has spent over one million dollars on the Sutherlin dealership. As AHM explains, this statement does not segregate plaintiff's investments for other ongoing franchises in the Sutherlin location. Even assuming (giving the plaintiff the benefit of favorable factual inferences) that significant funds supported the Honda franchise in Sutherlin, the investment was ill-advised because the relocation was unauthorized.

---

[6] A sports analogy may help illustrate this point. Suppose the legislature wanted to protect Major League Baseball players from being cut absent "good cause" and lists certain nonexhaustive factors for the court to consider: e.g., batting average, RBI production, home run total, stolen bases, and number of errors committed. A team in the National League (which does not have the designated hitter rule) decides to cut a player who ranks at or above average in most of the listed categories but is far below average on defense. Management accordingly decides that the player's defensive shortcomings outweigh his offensive production and thus waives him. Under such a statutory scheme, while the court may be called upon to consider all the factors, the court should not substitute its personal opinion in the matter nor rotely assign equal weight to each factor as if some mathematical equation were implicated. It is enough to conclude that management's decision was not arbitrary, i.e., that the player's defensive liabilities provide "good cause" for the decision.

16 Opinion and Order

Concerning subsection (2)(d), "[t]he adequacy of the franchisee's new motor vehicles sales and service facilities, equipment and parts," plaintiff contends that the Sutherlin facility is more than adequate because it is more spacious than his Roseburg location. For purposes of addressing defendant's summary judgment motion, the court accepts this representation as true. Nonetheless, as explained previously, the factors are not entitled to equal weight in the analysis.

Measured along with the remaining factors, Wing's convictions, which involve crimes of dishonesty involving his business, and his failure to comply with the agreed-upon and reasonable terms of the franchise agreement, justify termination. The court will not force AHM to continue its business relationship with Wing, whose convictions adversely affect AHM's reputation and violate the Sales and Service Agreements. Further, requiring the business relationship to continue after Wing's decisions to continue his Honda sales and repair after revocation of his license and the unauthorized relocation would eviscerate material provisions of the contracts to which Wing agreed and put this court in the business of regulating franchise relationships without respect to reasonable business expectations. Such an action would clearly exceed the legislative intent underlying Or. Rev. Stat. § 650.140, which was to protect franchisees from coercive and abusive trade practices. In sum, "good cause" exists for the termination of the Sales and Service agreements under Or. Rev. Stat. § 650.140(2).

CONCLUSION

17 Opinion and Order

Defendant's motion for summary judgment (#31) is granted.

IT IS SO ORDERED.

Dated this 25+ day of April, 2008.

_____
THOMAS M. COFFIN
United States Magistrate Judge

18 Opinion and Order